## NFL ARBITRATION

| | |
|---|---|
| In the Matter of an Arbitration between ) | |
| ) | |
| LANE JOHNSON, ) | |
| ) | |
| *Appellant,* ) | **ARBITRAL AWARD** |
| ) | **No. 2016--#2** |
| And ) | |
| ) | |
| NATIONAL FOOTBALL LEAGUE, ) | |
| ) | |
| *Respondent.* ) | |

## REASONED DECISION AND AWARD

I, THE UNDERSIGNED ARBITRATOR ("Arbitrator"), having been designated in accordance with the applicable rules of the National Football League Policy on Performance-Enhancing Substances (2015) (the "Policy"), and having been duly sworn and having duly heard the proofs, arguments, and allegations of the parties, and, after a hearing held on October 4, 2016, which was recorded and in which the above-named parties were present, do hereby find and issue this award ("Award") as follows:

### I. INTRODUCTION

1.1     This appeal arises from a determination that a urine specimen provided by Lane Johnson ("Mr. Johnson") on July 12, 2016 tested positive for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ that is a Prohibited Substance under the Policy.

1.2     By letter dated September 6, 2016, pursuant to the Policy, the NFL Management Council imposed a sanction on Mr. Johnson of suspension from the NFL without pay for ten games.

1.3     For the reasons given herein, Mr. Johnson's appeal of the penalty is denied.

### II. THE PARTIES

2.1     Appellant is Lane Johnson, represented by Stephen S. Zashin, Esq., Patrick J. Hoban, Esq. and David R. Vance, Esq. of Zashin & Rich Co., L.P.A.

2.2     Respondent is the National Football League ("NFL"), represented by Kevin Manara, Esq. and Meghan Carroll, Esq.

## III. JURISDICTION AND APPLICABLE RULES

3.1  Section 3 of the Policy provides for testing of Players for Prohibited Substances, including ▮▮▮ which is classified in Appendix A to the Policy as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The penalty for a second Positive Test Result for a Prohibited Substance under Section 6 of the Policy is a ten-game suspension. Mr. Johnson's suspension was imposed pursuant to that provision.

3.2  Section 9 of the Policy provides for appeals of sanctions under Section 6 to a third-party arbitrator not affiliated with the NFL, NFLPA or the NFL Clubs. The undersigned Arbitrator was selected under the provisions of Article 9. Section 10 provides that "Except as is expressly set forth elsewhere in this Policy, any dispute concerning the application, interpretation or administration of this Policy shall be resolved exclusively and finally through" the present appeal procedures.

3.3  The appeal involves primarily provisions of Sections 3 (Testing for Prohibited Substances), 4 (Procedures in Response to Positive Tests or Other Evaluation) and 11 (Burdens and Standards of Proof; Discovery) of the Policy, discussed in detail below.

## IV. FACTUAL BACKGROUND AND HISTORY

4.1  Mr. Johnson entered the NFL in 2013. In 2014, he tested positive test for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that was a Prohibited Substance, and received a four-game suspension. The positive test of Mr. Johnson's July 12, 2016 sample was his second positive test for ▮▮▮▮▮▮▮ and Section 6 of the Policy requires a suspension without pay for ten regular and/or postseason games for a second such violation, if proved.

4.2  On July 28, 2016 the Independent Administrator of the Policy, Dr. John A. Lombardo, advised Mr. Johnson of the positive test result of the "A" bottle of his urine specimen for ▮▮▮▮ and informed him of his right to have a qualified toxicologist of his choice observe a testing of the "B" bottle of the specimen.

4.3  Dr. Michael D. Levine observed the testing of the "B" bottle, which occurred on August 19, 2016, as Mr. Johnson's representative. The second test also was positive for ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ having essentially the same ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tr. 164-65), and Mr. Johnson was so advised by Dr. Lombardo on September 2, 2016.

4.4  On September 6, 2016 the NFL Management Council informed Mr. Johnson of the ten game suspension, and on September 8, 2016 his counsel filed a timely appeal.

4.5  Mr. Johnson's counsel submitted document discovery requests to the NFL on September 16, 2016, to which the NFL responded on September 20, after which Mr. Johnson's counsel replied on September 21. The requests were addressed at a conference call hearing with the undersigned Arbitrator on September 22 and in a Ruling on Discovery Requests and Objections (the "Ruling") dated September 26, 2016, which is incorporated herein by reference.

4.6 The Ruling was clarified and modified by an email on September 30, 2016, to which the NFL responded that day by stating in substance that no further documents were responsive to the Ruling.

4.7 On September 20, 2016 counsel for the NFL submitted a hearing binder containing documents on which the NFL relies.

4.8 Mr. Johnson's counsel thereafter submitted a Pre-Hearing Statement and accompanying documents, including his Basis of Appeal, on September 28, 2016.

4.9 On September 30, 2016 counsel for the NFL submitted copies of additional documents on which it might rely. On October 1, 2016 counsel for Mr. Johnson submitted a further letter addressing various arguments.

4.10 The appeal hearing took place on October 4, 2016 (the fourth Tuesday after September 6, as provided in the Policy), and was attended by Mr. Johnson, his counsel and counsel for the NFL. Counsel for the NFLPA, Joe Briggs, Esq. and Todd Flanagan, Esq., also participated, as did Heather McPhee, Esq., by telephone. Counsel for the parties presented argument and the testimony of Mr. Johnson, Mr. Paul Scott, Dr. Levine and Dr. Lombardo. The transcript was provided on October 7, 2016.

4.11 The evidence considered included a binder and supplemental exhibits identified as Tabs A through M, offered by the NFL, and Exhibits 1 through 36 offered on behalf of Mr. Johnson.

## V. THE PARTIES' CONTENTIONS

5.1 Mr. Johnson's Basis of Appeal first presented a series of arguments grouped under a heading asserting that the NFL could not meet its burden of proof because (a) his July 12 test was a "reasonable cause" test not authorized under the Policy, and (b) the collection and analysis of the specimen deviated from requirements of the Policy in that (i) the results of the "B" sample test were certified by the director of the testing laboratory rather than the Chief Forensic Toxicologist, (ii) the laboratory destroyed the specimens tested prior to final adjudication of the appeal, (iii) "the personnel that conducted the 'B' sample analysis were improper" and (iv) Mr. Johnson's right to have the "B" test observed by a toxicologist was "significantly undermined" by the NFL's refusal to provide the toxicologist (Dr. Levine) with "applicable laboratory protocols."

5.2 Mr. Johnson's Basis of Appeal presented a second, separate argument: that the presence of a Prohibited Substance in Mr. Johnson's urine was not due to his fault or negligence.

5.3 The NFL contends that Mr. Johnson's July 12 test was authorized by the Policy and that the collection and analysis of the sample were proper in all respects. The NFL maintains that Mr. Johnson violated the Policy because he tested positive for ▮ and has failed to establish that the Prohibited Substance was not present due to his fault or negligence because, in particular, he was negligent in consuming ▮ that appears to have caused the positive test without taking appropriate steps to investigate its contents.

- 3 -

5.4     The parties argued that various issues could be resolved by motion prior to the hearing of certain evidence, but the undersigned Arbitrator denied the motions and has considered all of the evidence introduced at the hearing.

## VI.    ANALYSIS AND DECISION

### A.    Authorized Reasonable Cause Testing

6.1     Section 11 of the Policy states:

"In any case involving an alleged violation due to a Positive Test, the Management Council shall have the burden of establishing the Positive Test Result and that it was obtained pursuant to a test authorized under the Policy. . .."

6.2     The Policy, adopted by the NFL and the NFLPA pursuant to their Collective Bargaining Agreement, provides in Section 3.1 for various types of testing, among which is "reasonable cause" testing for Players with prior positive tests, such as Mr. Johnson. The Independent Administrator of the Policy, Dr. Lombardo, may place such a Player in the reasonable cause program "at his discretion" and direct testing of that Player "both in-season and during the off-season at a frequency and duration determined by the Independent Administrator consistent with this Policy." (There is an annual test required of all Players, as well as random testing to which all Players are subject.)

6.3     Section 3.1 continues:

"Players who are placed into the reasonable cause program based on a violation of the Policy must remain in the program a minimum of two years or two full seasons, whichever is shorter, after which the Independent Administrator must either discharge the Player or notify him in writing that he will remain in the program subject to review at a later date."

6.4     This "two years or two full seasons" minimum time requirement for participation in the reasonable cause testing program was added to the Policy by the NFL and the NFLPA (the "Bargaining Parties") in the fall of 2014. Under the prior version of the Policy, there was no such time limit. Its purpose appears to be to assure that Players will receive notice at a specified time as to whether they will remain in or be discharged from the program rather than to leave this indefinite.

6.5     In the present case, after Mr. Johnson's first positive test Dr. Lombardo advised him by letter dated May 19, 2014 (Ex. 10) that he "will be placed on reasonable cause testing, under which you may be tested up to twenty-four (24) times per year (July 1st through June 30th)." Dr. Lombardo notified the NFL Management Council and the NFLPA on July 1, 2014 that Mr. Johnson "is subject to both disciplinary action and reasonable cause testing" (Ex. 11).

6.6     After an intervening appeal was resolved, Mr. Adolpho Birch on behalf of the Management Council advised Mr. Johnson on July 15, 2014 (Ex. 13) of discipline in the form of a four-game suspension and stated, "Additionally, you will remain on reasonable cause testing

for the remainder of your career and, before you may be reinstated, you must be approved to play by the Independent Administrator." This was consistent with the then-existing Policy, under which there was no two year minimum time duration for participation in the reasonable cause program. Mr. Birch had no role in determining when Mr. Johnson had been or would be placed in the reasonable cause testing program, which was in Dr. Lombardo's discretion.

6.7 The first reasonable cause program test of Mr. Johnson took place on August 18, 2014, and he was tested, on a schedule determined by Dr. Lombardo, at varying intervals thereafter throughout 2014, 2015 and 2016. Tests prior to the July 12, 2016 test in issue occurred on May 26 and June 2, 2016 (Ex. I). Mr. Johnson did not suggest at the time that his May, June or July 12, 2016 tests were not authorized.

6.8 One year after his first reasonable cause test in 2014, Dr. Lombardo advised Mr. Johnson by email of August 3, 2015 that "For the 2015-2016 season, you will remain on reasonable cause testing . . . Your status will be reviewed prior to the 2016-17 season." (Ex. H) This notice was the result of an agreement reached in the fall of 2014 among Dr. Lombardo and the NFL and the NFLPA about how to administer the Policy's new requirement that notice of their future status be given to Players in the reasonable cause testing program after a minimum interval. It was agreed that Dr. Lombardo would notify all Players who were to continue in or be dismissed from the program annually at a uniform time, in each August before commencement of a playing season.

6.9 Pursuant to this practice, Dr. Lombardo sent the same type of email notice to Mr. Johnson (and others similarly situated) on August 20, 2016 (also in Ex. H): "For the 2016-17 season, you will remain on reasonable cause testing . . . Your status will be reviewed prior to the 2017-18 season."

6.10 Mr. Johnson therefore received notice in writing that he would continue in the program at a time either at or about or shortly after conclusion of the first two years in which he participated in the program, however that two year or two season period is measured, which satisfies Section 3.1. That provision does not state that, in the absence of notice at a specific time, a Player is discharged automatically from the reasonable cause testing program on the day after he completes two years or two seasons in it.

6.11 However, Mr. Johnson contends that his July 12, 2016 test occurred more than two calendar years after he was placed in the reasonable cause program, which he argues occurred no later than July 1 of 2014, and that the test therefore was not authorized under the 2015 version of the Policy now applicable.

6.12 A Player may be "placed into the reasonable cause testing program" in two senses: first, when Dr. Lombardo decides that the Player's testing routine will be changed from random (the same as other Players) to "reasonable cause" (on numerous unannounced occasions specific to him), and second, when the Player's name actually is removed from the pool of Players subject only to random testing and he is scheduled by Dr. Lombardo for initiation of actual reasonable cause testing.

ActiveUS 158619106v.1

6.13    Dr. Lombardo decided that Mr. Johnson should be placed into the reasonable cause testing program at some point after reviewing the 2014 positive results of the "B" sample test in our around July of 2014 (Tr. 219). Dr. Lombardo's correspondence at that time reflected this intention, using language such as "you will be placed on" reasonable cause testing (Ex. 10, May 19) and "Mr. Johnson "is subject to" reasonable cause testing. (Ex. 12, July 1)

6.14    But the actual placing of Mr. Johnson in the program, in the second sense, occurred with removal of Mr. Johnson's name from the general random testing pool and the initiation of his reasonable cause testing, which did not occur until August 18, 2014. (Tr. 175, 252) That should be interpreted as the effective date of his being "placed into" the program for the purposes of Section 3.1 of the Policy.

6.15    This is consistent with the way in which the Bargaining Parties have interpreted the Policy since the "two-years or two full seasons" provision was added to it in September 2014. The commencement of the current Policy required the Bargaining Parties to agree in the fall of 2014 on how the new provision containing "two years or two full seasons" language was to be applied in practice. Dr. Lombardo advised, and they agreed, that he would give notice to Players whom he determined should continue in the program on an annual basis, in August just before the start of each playing season, without regard to when the Player initially had been placed in the program. Under that practice, Mr. Johnson was notified first in August 2015 and again in August 2016 that he would remain in the program.

6.16    It also is consistent with Mr. Johnson's understanding. When asked how long he understood he was to remain in the program after reading Dr. Lombardo's August 3, 2015 email, Mr. Johnson testified, "Until he told me." (Tr. 84)

6.17    Even assuming that Section 3.1 requires that a Player no longer be tested after an initial "two years of two seasons" participation in the program in the absence of some type of notice at or after that period ends, such a test would be satisfied here. Mr. Johnson's July 12, 2016 test took place within two calendar years from the date when he effectively was placed in the reasonable cause testing program, which was August 18, 2014.

6.18    Mr. Johnson argues, alternatively, that the "full season" referred to in the Policy is only a football playing season, so that any minimum two seasons limit on participation in the reasonable cause program in his case included the 2014-15 and 2015-16 playing seasons and ended in or about January 2016.

6.19    Again, this is not a proper reading of the Policy, even assuming it requires termination of reasonable cause testing after two seasons absent some sort of notice. Section 3.1 at various places uses the terms "preseason," "regular season," "postseason" and "off-season." The relevant term in issue here is "full season," which the Bargaining Parties and Dr. Lombardo consistently have interpreted in accordance with its sensible meaning to allow for testing on a year-round basis. (Tr. 168-71, 179) A "full season" as used here means a full calendar year running from the beginning of one season's training camps in August to the following August.

6.20    Consequently, Mr. Johnson's July 12, 2016 test occurred while he was properly in

- 6 -

the reasonable cause testing program and was authorized under the Policy.

### B. Collection and Analysis Issues

6.21 Section 11 of the Policy not only requires that the Management Council meet its burden of showing that a Positive Test Result was obtained in an authorized test. The NFL also must show that the test "was conducted in accordance with the collection procedures and testing protocols of the Policy and the protocols of the testing laboratory (herein collectively 'the Collection Procedures')."

6.22 In addressing this burden, the Management Council may rely on a presumption (set forth in Section 11) that collection and analysis procedures have been carried out in accordance with the Policy and "may rely solely" on the "standard laboratory documentation package," the contents of which are illustrated by Appendix G to the Policy, "to demonstrate that the test was conducted in accordance with the Collection Procedures, including, without limitation, that the chain of custody of the specimen was maintained."

6.23 A Player may challenge the Management Council's initial showing of regularity in the conduct of testing, made by its production of the standard laboratory documentation package, "if the Player alleges a deviation from the Collection Procedures with credible evidence."

6.24 The Management Council may rebut such "credible evidence" of a deviation by demonstrating that (a) there was no deviation; (b) the deviation was authorized by the [Bargaining] Parties; or (c) the deviation did not materially affect the accuracy or reliability of the test result."

#### 1. Certification of the "B" Sample Test

6.25 Section 4.2 of the Policy states that if a "B" sample analysis generates a positive result, "and the Chief Forensic Toxicologist certifies that result," the independent Administrator provides notice of that result to the Player and the NFL and NFLPA.

6.26 The positive result of Mr. Johnson's "B" sample analysis was certified (Ex. E) by Dr. Anthony Butch, Director of the UCLA Olympic Testing Laboratory, because the position of Chief Forensic Toxicologist had fallen vacant due to retirement. The Bargaining Parties have agreed that such analyses at present may be certified by the director of the testing laboratory. (Tr. 8-9, 16)

6.27 That agreement, which counsel for the Bargaining Parties stated is recorded in a writing, constitutes an amendment of the Policy, not a deviation from it in Mr. Johnson's case. Even were it a deviation, it was authorized by the Bargaining Parties and did not materially affect the accuracy or reliability of the test result.

#### 2. Destruction of Specimens

6.28 Section 16 of the Policy requires that the Bargaining Parties agree on procedures

- 7 -

that "will ensure the destruction of negative specimens within 90 days of analysis and positive specimens within 30 days of final adjudication of a Player's discipline."

6.29   The tests of Mr. Johnson's sample involved only aliquot portions of the "A" and the "B" bottles. The documentation packages disclose that the aliquots of urine tested were discarded after testing, but there is no evidence that the remainder of the samples were destroyed nor that any deviation from the Policy has occurred.

6.30   There was no deviation from the Policy in this regard, nor would any deviation have materially affected the accuracy or reliability of the test result.

### 3.   "Improper" Testing Personnel

6.31   Section 11 of the Policy requires that "No later than four (4) business days prior to the hearing, the Player will complete and submit a statement setting forth the specific grounds upon which the appeal is based with supporting facts in the form of proffered testimony or documentary evidence," which form the Player's "Basis of Appeal." Mr. Johnson's Basis of Appeal in this case included the assertion that "the personnel that conducted the "B" sample analysis were improper," without further elaboration.

6.32   Section 4.2 of the Policy requires that each "B" sample test "be performed at the same laboratory that did the 'A' sample analysis according to the established analytical procedures and <u>by a technician other than the one performing the 'A' confirmation test</u>." (Emphasis added.)

6.33   In their letter of Saturday, October 1, 2016, Mr. Johnson's counsel elaborated on the Basis of Appeal's assertion by mentioning this requirement for the first time. The letter noted that neither the Policy nor the documentation package defines a "technician" for this purpose and stated that the documentation package "reveals that the same individuals were involved in <u>handling</u> both the 'A' and the 'B' samples during the confirmation tests" and performed "aspects of" the two tests. (Emphasis added.) Mr. Johnson's counsel stated in that letter that "witness testimony and examination of the exhibits submitted will demonstrate that the NFL and/or the testing laboratory violated the Policy as to this specific provision."

6.34   Counsel for the NFL objected that the Basis of Appeal gave no adequate notice of this argument and that it was untimely. In addition, no testimony was offered at the hearing on this point, and the relevant record evidence is limited to the documentation package. Mr. Johnson's counsel did not call attention to any part of the package that disclosed the contested "handling." Both sides listed Dr. Butch as a potential witness, but neither called him to testify.

6.35   This argument of a deviation from the Policy is untimely made, appears to have been essentially abandoned and, in any event, is not persuasive. There was no evidence that any deviation would have had a material effect on the accuracy or reliability of the test result.

### 4.   Applicable Testing Laboratory Protocols

6.36   As noted above, Section 11 of the Policy requires that tests be conducted "in

accordance with the collection procedures and testing protocols of the Policy and the protocols of the testing laboratory," all of which are defined collectively as the "Collection Procedures." There is no separate definition in the Policy of a "protocol," which in this context is a generic reference to a procedure, nor was any document included in the record identified with the label "protocol." Appellant's witness Mr. Scott, the President of a testing laboratory, testified that a "protocol" is "a broad term that could refer to any number of things." (Tr. 120-21)

6.37 Some of the procedures or protocols included in the "Collection Procedures" of the Policy are contained in the Policy itself, such as Sections 3.2, 3.4 and 4.2 and Appendix G. Others are found in the documentation package. In this case the documentation packages for both of the tests included the laboratory's "Screening Procedure for Selected Steroids and Glucocorticosteroids by LC-MS/MS" and the "Confirmation Procedure for ▓▓▓▓" both of which could be described as protocols of the testing laboratory. Counsel for the NFL confirmed in response to discovery rulings that there were no other laboratory protocols of this type relevant to this case.

6.38 These descriptions of procedures are summaries of laboratory operating procedures but are not the full details of the procedures. Mr. Johnson's counsel argue that an observing toxicologist such as Dr. Levine, who observed the test of the "B" sample on Mr. Johnson's behalf, could not perform an effective observation without access to the UCLA Olympic Testing Laboratory's Laboratory Procedures Manual because such a manual exists and might contain additional information about how tests are intended to be conducted.

6.39 The Policy does not authorize an observing toxicologist to "audit" the laboratory procedures for compliance with an operating manual, but only to observe what the technicians actually do in testing a "B" sample. During 26 years of operations under the present Policy and its predecessors, there is no known case in which an observing toxicologist was provided with documents other than the standard documentation package provided for in the Policy. (Tr. 249-50)

6.40 When asked about specific additional information that might have aided his observation, Dr. Levine referred only to a log of the temperature at which the sample had been maintained in the freezer (Tr. 147), which did not form part of the test that he was observing. A toxicological observer is not authorized to audit all of the testing laboratory's procedures, and discovery of documents requested for such a purpose are not permitted by the Policy.

6.41 As regards the actual observation, Dr. Levine testified that he saw an example of "poor methods" in the handling of sodium bicarbonate used in testing the pH of the sample, which made it "possible" that there "some contamination." (Tr. 148-49) He concluded, however, that he could not state definitely whether there was or was not any contamination. (Tr. 156-57) This testimony did not rebut with credible evidence the initial showing that the test result was positive and obtained pursuant to a test conducted in accordance with the Policy's Collection Procedures.

6.42 For all of these reasons, none of the collection and analysis issues raised by Mr. Johnson support an appeal of the sanction.

C.  **Absence of Fault or Negligence**

6.43  The Policy states in Section 3.5 that "Players are responsible for what is in their bodies and a positive test will not be excused because a Player was unaware that he was taking a Prohibited Substance." If a there is a Positive Test Result, Section 11 provides that "The Management Council is not required to otherwise establish intent, negligence or knowing use of a Prohibited Substance on the Player's part."

6.44  An affirmative defense is available to a Player after a Positive Test Result if he can establish that the presence of the prohibited substance leading to that result "was not due to his fault or negligence." Denial of intention to ingest a Prohibited Substance is not alone an excuse, although an absence of intent or negligence may be a defense, with the Player bearing the burden of proof, if it is supported by "objective evidence." Section 11 states explicitly that "A Player cannot satisfy his burden merely by denying that he intentionally used a Prohibited Substance; that he was given the substance by a Player, doctor or trainer; or that he took a mislabeled or contaminated product. . ."

6.45  The NFL cautions Players about use of ▇▇▇▇▇▇▇▇▇▇▇▇ On August 6, 2015 Dr. Lombardo, as the Independent Administrator of the Policy, emailed Players, including Mr. Johnson, a copy of a ▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. 15)

6.46  It warned that ▇▇▇▇▇▇▇▇▇▇▇▇ **as to effectiveness, adverse effects or tested for ingredients**" and that "The NFL Policy for Performance Enhancing Substances is a strict liability policy—**you are responsible for what is in your body**." (Emphasis in original.) The memo advised that Players could consult any of three sources for information concerning supplements: a computer database known as NSF Certified for Sport, which contains a list ▇▇▇▇▇▇ that have been tested for ingredients and Prohibited Substances; a USADA (U.S. Anti-Doping Agency) web site concerning ▇▇▇▇▇ and Dr. Lombardo himself.

6.47  Dr. Lombardo's email included a separate July 2015 announcement concerning ▇▇▇▇▇▇▇▇▇▇▇▇ It warned that ▇▇▇▇▇▇▇▇▇▇▇▇ may contain substances that are prohibited" by the NFL Policy and cautioned in large, bold-faced type, "**I strongly urge you not to take any** ▇▇▇▇▇▇▇▇▇▇▇▇" It added, however, "The prescription medications ▇▇▇▇▇▇▇▇ are not banned by the policy." The announcement suggested that any questions be directed to Dr. Lombardo by email or by phone.

6.48  Mr. Johnson testified that he had obtained a prescription from a doctor, apparently affiliated with his team, for the prescription drug ▇▇▇▇▇▇▇▇▇▇▇▇ Although no medical evidence was introduced, Mr. Johnson testified that he was taking an ▇▇▇▇▇▇▇▇▇▇ and that ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ (Tr. 70)

6.49  While training prior to camp during the summer of 2016, Mr. Johnson was told over lunch by friends after a workout that "there was a faster acting version" of ▇▇ called

▇ Mr. Johnson testified that a friend provided to him and he consumed what was described to him as ▇ in a ▇ on two occasions prior to his July 12, 2016 test. (Tr. 72-73)

6.50 Mr. Johnson further testified that, before consuming what he was told was ▇ he used his cell phone to consult a web site named Aegis Shield, a source of information about products that had been identified to Players by the NFLPA, using the search term ▇.' The Aegis Shield web site responded with a web page (Ex. 30) showing pictures of ▇ and another web page (Ex. 31) showing a ▇ with the accompanying language "Label Review OKAY." The Aegis Shield page contained the following additional language (Ex. 31 and 31A):

> "You and you alone are responsible for what goes into your body. Take at your own risk. After evaluation of the ingredients listed on this product's label, there are no substances in violation of NFL's prohibited substances policy. . . Aegis Shield compares the ingredients listed on the product label to known banned substances. Aegis has not performed a laboratory analysis of the contents of this product for banned substances. Aegis is not responsible for the accuracy or completeness of the declared ingredients. No manufacturer can declare that its product is 'free of banned substances' because it is not possible to analyze for all banned substances. Products that receive the OKAY status could theoretically contain banned substances not listed on the label. Athletes should always consult with team officials or a healthcare professional before consuming dietary supplements."

6.51 Mr. Johnson testified that, having accessed the Aegis Shield web site with the inquiry ▇ and received access to this information, he concluded without further inquiry that ▇ was the ▇ ▇ is just the brand name they put on the shelves." (Tr. 72-73) He said that he did not read the warning language that followed the large word "OKAY" on the Aegis Shield web site. (Tr. 101-03)

6.52 Aegis Shield is a web site that the NFLPA suggests Players may use to check the label contents of supplements they consider using. The NFLPA materials about Aegis Shield in the record (Exs. 8 and 9) include a warning that ▇ over-the-counter medications because they are not FDA regulated. One of the exhibits states that a Player "cannot have 100% confidence that such products' listed ingredients are what is actually contained in each bottle/container. So, a player can hope that a product that doesn't list a banned substance on its label is fine, but alas, there are no 100% guarantees. **Bottom line, there is always a risk taking** ▇ **because** the NFL's performance enhancing drug policy is like all workplace drug policies, meaning that even if player doesn't intentionally or knowingly ingest a banned substance, it it's in the person's body, it's a violation." (Emphasis in original.)

6.53 The NFLPA advisory continues:

> "With all of that said, if you want to check whether a specific product actually lists a banned substance as an ingredient, in which case it's a definite NO as far as a player

ingesting, you can go to your phone's app store, download the (free) Aegis Shield, which has large database of products."(Ex. 8)

 6.54 Neither the NFL nor Dr. Lombardo as Independent Administrator recommends or endorses Aegis Shield, and it is not one of the sources that Dr. Lombardo recommends that Players use to check on supplements' contents. (Tr. 88-89, 112, 184-85, 233)

 6.55 ███████████ drug regulated by the FDA. ███████████████ ███████████████████ (Tr. 191), and a non-FDA-approved product that might be available on the Internet described as ███████ " or what is provided by a friend and described as ███████ " would be considered ███████████ and would be highly unlikely to be precisely the same as the ███████████████.

 6.56 During the pendency of this appeal, counsel for Mr. Johnson provided ███████ ███████████████████████████████ to Korvalabs, Mr. Scott's laboratory, for testing. The sample provided was sealed and was not identified as the actual ███████ that Mr. Johnson consumed. The sample tested positive for ███████ (Ex. 33).

 6.57 Mr. Johnson appears to have consumed an ███████████████ which he incorrectly believed to be equivalent to prescription ███ which likely was the source of the ███████ in his positive test of July 12, 2016.

 6.58 Mr. Johnson knew that the product he consumed was not ███ and he appears to have relied on assurances from friends and the single word "OKAY" on a web site showing a ███████████████████████ as the basis for determining that he could safely proceed.

 6.59 Mr. Johnson's conduct in doing so was negligent and does not provide a basis for a defense to the imposition of a sanction in this case.

## VII. AWARD

WHEREFORE, for the reasons set forth above, the appeal in this matter is denied.

Dated: October 11, 2016

              _James N. Carter_
              James H. Carter, Arbitrator

ActiveUS 158619106v.1

STATE OF NEW YORK )
                               )   SS.:
COUNTY OF NEW YORK )

On this 11th day of October, 2016, before me personally came and appeared James H. Carter, to me known and known to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

*[signature]*
Notary Public

SUSAN A. DALESSANDRO
NOTARY PUBLIC, State of New York
No. 01DA4954898
Qualified in Richmond County
Commission Expires Aug. 21, 2017